1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## EASTERN DISTRICT OF CALIFORNIA

10

| | |
|---|---|
| WILBERT C. SEBBERN, JR.,<br><br>                    Plaintiff,<br><br>    v.<br><br>MICHAEL J. ASTRUE, Commissioner<br>of Social Security,<br><br>                    Defendant. | )  1:08cv01768 GSA<br>)<br>)<br>)  ORDER REGARDING PLAINTIFF'S<br>)  SOCIAL SECURITY COMPLAINT<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

11
12
13
14
15
16
17
18

19

## **BACKGROUND**

20          Plaintiff Wilbert C. Sebbern, Jr. ("Plaintiff") seeks judicial review of a final decision of

21  the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application

22  for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is

23  currently before the Court on the parties' briefs, which were submitted, without oral argument, to

24  the Honorable Gary S. Austin, United States Magistrate Judge.[1]

25
26
27

28          [1] The parties consented to the jurisdiction of the United States Magistrate Judge.  On December 12, 2008, the action was reassigned to the Honorable Gary S. Austin for all purposes.

## FACTS AND PRIOR PROCEEDINGS[2]

Plaintiff filed an application on or about November 17, 2003, alleging disability since January 24, 2002, due to degenerative disc disease, hearing loss in the right ear and an adjustment disorder.  AR 20, 22, 123-125.  His application was denied initially and on reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 90-94.  ALJ Michael Friedman held a hearing on May 18, 2005, in New York, and issued an order denying benefits on June 16, 2005.  AR 37-53, 491-498.  On August 2, 2006, the Appeals Council vacated the decision and remanded for further proceedings.  AR 506-508.  On March 22, 2007, ALJ James Berry held a video hearing in Fresno; Plaintiff appeared in Bakersfield.  On July 3, 2007, ALJ Berry issued an order denying benefits.  AR 20-28.  On September 23, 2008, the Appeals Council denied review.  AR 8-10, 16.

2007 Hearing Testimony

ALJ Berry held a video hearing on March 22, 2007, in Fresno, California.  Plaintiff appeared and testified from Bakersfield, California.  He was represented by Robert Lowenstein.  Vocational Expert ("VE") Jose Chaparro also testified.  AR 54-88.

Plaintiff is married and has two children, aged twenty months and sixteen years.  AR 68-69.  He completed twelfth grade and attended vocational training to become a cook in the early 90's.  AR 69.

Plaintiff stopped working on January 24, 2002, because he was injured on the job.  He and a coworker were delivering 400 pounds of material via a hand truck, down a set of basement stairs.  A portion of a step "chipped away," the material on the hand truck toppled, and Plaintiff was crushed.  AR 58.  He suffered injuries to his head, neck, back, right shoulder, right elbow, both hands and right knee.  AR 58.  The workers' compensation case related to his injuries was resolved in 2005.  AR 69.

With regard to the injury to his head, Plaintiff suffers "consistent" headaches, every day.  AR 58.  He experiences bad headaches three to four times per week, "like a migraine."  AR 66.

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1    Sometimes the headaches last a day or two.  AR 66.  When he gets such a headache, he turns out

2    the lights to darken the room as much as possible and closes his eyes.  He uses medication and

3    hot towels to obtain relief.  AR 67.  He suffered hearing loss in his right ear due to a severed ear

4    drum.  AR 58-59.

5    Plaintiff underwent surgery on his right shoulder and has a limited range of motion as a

6    result.  AR 59.  The surgery was performed in December of 2003 or 2004.  AR 62.  When he lifts

7    and extends the shoulder, he gets "a pull across the whole back, and a sensation of pain up and

8    down the back, and across the shoulders."  AR 59.  He cannot raise his arm in the air, nor can he

9    rotate his shoulder as he would have been able to do prior to the injury.  AR 65.

10   With regard to the right elbow and hand injuries, he "chipped a bone" in his right elbow

11   and experiences pain that travels down his arm.  Both hands are affected and there is a visible

12   knot on his left hand.  AR 59.

13   Plaintiff suffers from constant, every day back pain, and participates in a pain

14   management program.  The pain radiates down the back of his legs and into the heels of his feet.

15   Both feet swell, and on occasion he cannot wear shoes.  The pain intensifies with movement and

16   he cannot get comfortable when lying down.  He testified that it is "a miserable feeling."  AR 60.

17   Plaintiff indicated doctors wanted to perform a back surgery involving placing "a rod in the

18   spine."  He elected not to proceed with the surgery because it offered only a thirty percent chance

19   of relief.  AR 62.

20   Right knee surgery was performed on March 24, 2002, however, as he was returning

21   home from the surgery itself, he was involved in a motor vehicle accident.  He believes the knee

22   never fully or properly healed as a result.  AR 60, 62.  He has a limited range of motion in the

23   right knee, coupled with "consistent" swelling in the right knee and foot.  AR 60-61.

24   Plaintiff indicated a cane was prescribed by "Dr. Flum" at the time he underwent surgery on his

25   right knee.  AR 61.

26   Plaintiff also suffers from anxiety and mood swings.  AR 61.  "[A] lot of mental [anxiety]

27   . . . aggravating all of the other injuries" he suffered from prior to the car accident.  AR 61.  He

28   does not like to be around a lot of people; he prefers to stay secluded and unto himself where he

3

is most comfortable.  AR 65-66.  Being around others makes him nervous; he believes they are watching him.  AR 66.  A doctor prescribed Wellbutrin; sometimes it helps and other times it does not.  AR 67.

Following the car accident, Plaintiff also suffered injuries to his left shoulder and left knee.  The left knee is an on-and-off again situation.  He believes those injuries "aggravate[] everything else that was there and intensi[fy] the headaches even more."  AR 61.

When asked how long he could stand without requiring a break, Plaintiff indicated if it were a bad day he could stand for about fifteen to twenty minutes before needing a break.  He suffers bad days about four or five days a week.  AR 62-63.  Plaintiff can sit for about thirty to forty minutes before he would need to stand up and move around.  AR 63-64.  He can lift ten to fifteen pounds, but cannot do so repetitively.  He surmised he could lift that weight four or five times during the course of a day.  AR 64.

Plaintiff cannot grasp items well because his hands are "clumsy."  AR 64.  He has carpal tunnel syndrome in both hands, and suffers from tremors in both hands.  He has dropped items several times as a result of this condition.  AR 65.

The side effects from prescribed medications cause Plaintiff difficulty as well.  He is "drowsy all the time [and] nauseous."  AR 67.  Anti-inflammatories will intensify his headaches for "three, four, five days straight."  AR 68.

The ALJ asked Plaintiff to imagine an eight-hour work day.  Considering morning and afternoon breaks, and a one-hour lunch period, the ALJ asked how long he could stand.  Plaintiff replied "[a]bout two and a half hours if that."  AR 70.  Asked how much walking he could do, with or without a cane, Plaintiff replied that he could not walk much without the cane.  Using the cane, Plaintiff could walk about a half a block to a block.  AR 69-70.  Plaintiff believes he could lift and carry seven to ten pounds during day, with his cane.  AR 70-71.  He could sit for about forty-five minutes to an hour during the course of an eight-hour workday.  AR 71.

Plaintiff typically spends his day lying, sitting and standing, trying to get comfortable.  He will try to make the bed.  He has attempted to do some cooking, but he had an accident and his wife does not want him in the kitchen.  On that particular occasion, he did not realize the pot was

1   hot, touched the lid and burned the insides of his hands.  He drives short distances when

2   necessary.  AR 72-73.

3        When Plaintiff last worked in 2002, he was working at a warehouse for a specialty food

4   store.  The warehouse would deliver high end foods to restaurants in the area.  He operated a

5   forklift, supervised others, and assisted the drivers when the job called for a two-man delivery.

6   AR 74-75.  In that position, he would lift and carry well over 50 to 150 pounds.  AR 75.  Plaintiff

7   also has previous experience in child care.  He worked for the Mission of the Immaculate Virgin,

8   assisting children with disabilities and mental disorders at a group home facility.  He was a child

9   care counselor on site from 4 p.m. in the afternoon until midnight.  He assisted the children with

10  homework after school, various activities, et cetera. The counselors "were like parents."  AR 75-

11  76.  The position did require the ability to restrain children who may weigh up to 250 to 300

12  pounds.  AR 77.  Additionally, Plaintiff worked as an institutional cook for the North Hampton

13  County Board of Education, and was a machine operator at Borden Chemical on the east coast.

14  He ran product through a "splitter."  In both the institutional cook and machine operator

15  positions, he would lift 50 to 100 pounds.  AR 76-77.

16       VE Chaparro testified that Plaintiff's previous work included the following Dictionary of

17  Occupational Titles ("DOT") codes: children's institutional attendant, defined as medium yet

18  performed as heavy work, DOT 359.677-010; store laborer, unskilled, DOT 922.687-058;

19  institutional cook, defined as medium work, DOT 315.361-010.  AR 78-81.

20       The VE was asked to consider several hypothetical questions posed by the ALJ. First, the

21  VE was asked to assume a thirty-eight year old individual with a twelfth grade education and the

22  past work experience previously described, who has the ability to lift and carry twenty pounds

23  occasionally and ten pounds frequently, with the ability to stand and walk for six hours of an

24  eight-hour work day, who can perform simple repetitive tasks and can maintain attention,

25  concentration, persistence and pace, has the ability to relate to and interact with others and adapt

26  to usual changes in the workplace and can adhere to safety rules, but must avoid concentrated

27  exposure to loud noise.  AR 81.  The VE opined that such an individual would be unable to

28  perform Plaintiff's past work.  AR 81-82.  However, such an individual could perform jobs in the

1  national economy.  For example, the individual could perform work as a bottling line attendant, a

2  light, unskilled position, DOT 920.687-042.  There are currently 1,000 such jobs in California

3  and 7,500 nationally.  AR 81-82.  The individual could also perform work as a case splitter of

4  meat products, light, unskilled, DOT 525.687-014.  There are approximately 900 jobs in

5  California and 9,800 nationally.  Lastly, the individual could perform work as a housekeeping

6  cleaner, light, unskilled, DOT 323.687-014.  There are approximately 18,900 positions in

7  California and 143,300 nationally.  AR 82.

8       In a second hypothetical, the ALJ asked the VE to assume an individual with the same

9  vocational parameters, but whom could stand two and a half hours in an eight-hour work day,

10  could walk the distance of one block, could sit for forty-five to sixty minutes in an eight-hour

11  work day, could lift ten to fifteen pounds occasionally and seven to ten pounds frequently, who

12  had difficulty gripping and grasping, must avoid exposure to large crowds and loud noise, and

13  must avoid dominant use of the right upper extremity in overhead activities.  AR 83.  This

14  individual could not perform Plaintiff's past work according to the VE.  Further, this individual

15  would be unable to perform any work in the national economy.  AR 83.

16       In a third hypothetical posed by Plaintiff's counsel, the VE was asked to assume that the

17  individual in hypothetical number one also was unable to perform fine hand manipulations.  The

18  VE indicated such an individual would be unable to perform work as a bottling line attendant or

19  housekeeping cleaner.  AR 84.  Asked to add a moderate limitation regarding the ability to work

20  with other, interact appropriately with the general public, ask simple questions or request

21  assistance, accept instructions and respond appropriately to criticism by supervisors, with a

22  moderate ability get along with coworkers or peers, and moderate ability to set realistic goals and

23  make plans independently of others, the VE opined that such an individual would be unable to

24  perform any of the jobs identified.  AR 84.

25       Next, the VE was asked to assume what impact the individual's need for a cane at all

26  times would have such that the individual could perform a job with one hand.  The VE responded

27  such an individual could not perform the jobs he identified previously.  AR 85-86.  Thereafter,

28  the VE was asked to assume the same individual in the third hypothetical scenario, including the

1  limitation regarding fine hand manipulation, who could stand and walk for two hours in an eight-

2  hour day and sit for six hours in an eight-hour day, such that the individual was limited to

3  sedentary work.  The VE indicated that the individual would be unable to perform the previously

4  identified positions as a bottling line attendant and housekeeping cleaner, but could still perform

5  the duties of a case splitter.  AR 86.  Lastly, the VE was asked to assume that the individual had

6  the ability to lift five pounds, stand and walk less than two hours in an eight-hour work day, sit

7  less than six hours in an eight-hour work day, without the ability to lift, carry, reach, pull, and

8  push with his shoulder, including the limitation related to fine hand manipulation.  Such an

9  individual, according to the VE, would be unable to perform any other work.  AR 87.

10          Medical Record

11          The entire medical record was reviewed by the Court.  A summary of the most relevant

12  reports and treatment notes is provided below.

13          *Bellevue Hospital Center*

14          Records of January 24, 2002, indicate Plaintiff was seen in the emergency room after

15  sustaining injuries when a hand truck weighing 100 pounds fell on him.  Plaintiff complained of

16  pain to the right ear, right shoulder, right elbow and right knee.  AR 183-187.  A radiology report

17  of that same date of the C-spine reveals prevertebral soft tissues within normal limits, normal

18  alignment and height of the vertebral bodies, and intervertebral disc spaces within the normal

19  range.  No acute fracture or dislocation was found.  AR 188.  A CT scan of Plaintiff's head on

20  January 24, 2002, revealed no acute intracranial pathology.  AR 189, 193.  X-rays of the right

21  elbow and right shoulder likewise revealed no acute fracture or dislocation.  AR 191-192.

22          *Donald R. Weisman, M.D.*

23          Dr. Weisman treated Plaintiff with regard to the hearing loss in his right ear on a single

24  occasion, March 7, 2002.  His treating diagnosis was sensorineural hearing loss.  Dr. Weisman's

25  findings revealed audiometer testing with reduced findings in the right ear, to wit:

| Decibels | Left Ear | Right Ear |
|----------|----------|-----------|
| 500 HZ | 15 | 60 |
| 1000 HZ | 15 | 45 |

7

| | | | |
|---|---|---|---|
| 1 | 2000 HZ | 10 | 55 |
| 2 | 3000 HZ | 30 | 60 |

The testing did not include the use of a hearing aid.  Plaintiff's ability to produce speech which can be heard, understood and sustained was good.  Dr. Weisman's notes indicate he could not answer an inquiry as to Plaintiff's work-related physical activities and any limitations thereto.  The records indicate Plaintiff failed to keep three additional follow-up appointments.  AR 216-222; *see also* AR 270.

### Cabrini Medical Center

Plaintiff underwent right knee surgery, performed by surgeon Francis A. Pflum, M.D., on May 24, 2002, to repair a tear of the medial meniscus.  Surgical repairs were made by way of arthroscopy, partial medial meniscectomy, and chondroplasty.  AR 226-227.

### Physical Therapy Records

A May 29, 2002, record of Arthur J. Nelson, Ph.D., F.A.P.T.A., records subjective complaints of sleep disturbance due to pain in the morning and evening, loss of hearing in the right ear, "pulling" on the right side of the neck, continuous low back pain, and pain rated at a 9.5 on a scale of 1 to 10.  AR 210.  Dr. Nelson's objective findings include active cervical ROM on the CROM device with findings of rotation on the left side at thirty-five degrees and twenty-five degrees on the right side with pain; flexion of twenty-five percent on the left side with pain; extension of twenty degrees on the left side with pain; and lateral flexion of twenty-five percent on both the left and right sides with pain.  AR 210.  A positive Tinel's sign was noted at the right elbow, and numbness present at the right leg, and right forearm and hand.  AR 211.  Dr. Nelson's treatment goals included decreased pain, increased flexibility, and strengthening of the right upper extremities, neck, truck and right leg.  Treatment was recommended three times a week for a four-week period.  AR 211.  A June 13, 2002, evaluation by Dr. Nelson notes sixty-five percent flexion of the right knee with the ability to straighten the knee.  AR 214.  Plaintiff was also seen in Dr. Nelson's office on June 6, 13, 20.  AR 213, 215-216.

1    ***Dr. Charles Connolly***

2        Chiropractor Charles Connolly examined Plaintiff on May 31, 2002.  The doctor's

3    diagnosis included cervical disc displacement, cervalgia, thoraco-lumbar radiculopathy, lumbar

4    myofascitis/lumbalgia, and left knee pain.  AR 239.  Dr. Connolly's treatment plan included

5    sessions two to three times per week, consisting of manipulation, trigger point therapy and

6    various stretching techniques.  Prognosis was guarded.  AR 240.

7        ***Dr. Eleanor Lipovsky, M.D.***

8        Internist Eleanor Lipovsky, M.D., completed an internal medicine consultation on June 3,

9    2002.  Her objective findings regarding Plaintiff included a normal general appearance, and

10   limping gait with use of walking cane.  Normal findings were recorded regarding the head, neck,

11   chest, and abdomen.  Decreased range of motion was present in the cervical and lumbar spine.

12   Muscle spasm and tenderness were present as well.  Straight leg raising test was positive on both

13   sides.  Muscle spasm, tenderness and decreased range of motion were recorded in both knees,

14   with swelling and increased palpitation and spasm upon palpitation.  AR 244-245.  Dr. Lipovsky

15   diagnosed headaches, anxiety, cervical spine sprain/strain, lumbosacral sprain/strain, bilateral

16   knee sprain/strain, and sought to rule out cervical disc displacement, cervical

17   radiculitis/radiculopathy, lumbosacral disc displacement, lumbosacral radiculitis/radiculopathy,

18   and bilateral knee ligament tear/meniscus tear.  AR 245.  The doctor's treatment plan involved

19   no heavy work, physical therapy and a home exercise rehabilitation program.  Numerous referrals

20   were made for further testing and evaluation.  Plaintiff was prescribed Motrin and Flexeril.  AR

21   246.  Dr. Lipovsky noted a guarded prognosis.  AR 247.

22       Plaintiff attended physical therapy following referral by Dr. Lipovsky at Physical

23   Therapy, P.C., at the same location.  *See* AR 248-252.

24       ***Richmond Radiology, P.C.***

25       Plaintiff was seen by Board Certified Radiologist Robert D. Solomon, M.D., on June 7,

26   2002, for an x-ray of the left knee.  The doctor's impressions included patellar spurs, equivocal

27   bone island distal femur, and lucency with some sclerosis proximal tibia of uncertain

28   significance.  AR 234.  An MRI of the cervical spine performed this same date revealed

1  straightened cervical lordosis, prominent adenoids and palatine tonsils, C3-C-4, C4-C5 and C5-

2  C6 central herniations, and cord compression and spinal stenosis.  AR 235.

3      On July 1, 2002, Dr. Solomon performed an MRI of the left knee.  Comparison was made

4  to the earlier x-ray.  Dr. Solomon's impression included intrameniscal signal, posterior horn

5  medial meniscus, and bone island formation of the distal femur.  AR 233.

6      Plaintiff was seen by Dr. Solomon again on July 17, 2002.  An MRI of the lumbar spine

7  revealed a moderate bulging disc at L5-S1, with thecal sac effacement and bilateral neural canal

8  narrowing.  The remainder of the study was normal.  Dr. Solomon's impression included

9  straightened lumbar lordosis, transitional vertebrae, lumbo-sacral junction, moderate disc bulging

10  at L5-S1, and resulting thecal sac effacement and bilateral neural canal narrowing.  AR 231.

11      ***Richmond Imaging***

12      An MRI of the right shoulder was performed on March 21, 2002, by Alan Berly, M.D.

13  Dr. Berly's impression noted no evidence of a rotator cuff tear, and minor degenerative changes

14  of the AC joint without evidence of impingement.  AR 378, 389.

15      An MRI of the head was performed on November 25, 2002, by Alan Berly, M.D.  Dr.

16  Berly's impression included normal non-gadolinium enhanced MRI of the brain.  Some rhino-

17  sinusitis was noted, but otherwise the examination findings were normal.  AR 271-272

18      An MRI of the cervical spine was performed on December 6, 2002, by David Rosenthal,

19  M.D.  Dr. Rosenthal's impression included bulging of the annulus at C3-4, C4-5 and C5-6,

20  including reversal of the normal cervical lordosis suggesting spasm; suggestion of a 10mm signal

21  alteration involving the dorsal aspect of the cord at C3-4 with suggestion of slight cord expansion

22  and the possibility of cord contusion.  AR 262-263.

23      A February 6, 2003, MRI of the cervical spine by Karl Hussman, M.D., included the

24  impression of a solitary cord lesion centrally, slightly toward the right of midline at C3, with no

25  appreciable change from the December 2002 examination; a 3mm ventral subluxation of C6

26  under C5, unchanged; and bulges at C3/4 through C5/6 with cord contact at C4/5, unchanged.

27  AR 261.

28

1

### Staten Island Chiropractic

2    In a report apparently prepared for the New York State Office of Temporary and

3    Disability Assistance, David C. Abrams, D.C., reported he first treated Plaintiff on February 20,

4    2003.  His treating diagnosis included cervical disc bulges at C3-C4, C4-C5 and C5-C6, right

5    bronchial neuritis, pain in right shoulder and suspected herniated thoracic disc.  AR 253.  Dr.

6    Abrams indicated limitations including the ability to lift and carry five pounds, stand and/or walk

7    less than two hours per day, sit less than six hours per day, and an inability to "lift, carry, push,

8    pull, work over shoulder level or do fine hand manipulation."  AR 256.

9

### John C. L'Insalata, M.D.

10    A June 19, 2003, report by Dr. John C. L'Insalata of Orthopaedic Surgical Consultants,

11    P.C., notes Plaintiff advised the doctor his injuries occurred on January 24, 2002, when he was

12    moving a "300 or 400 pound hand truck" and it fell and struck him on the shoulder, knocking

13    him down.  Plaintiff advised he was treated in the ER for a "'dislocated'" shoulder.  AR 264.  A

14    physical examination revealed a "painful arc in the right shoulder" with restricted movement,

15    crepitus of the shoulder with range of motion, and tenderness at the AC joint.  Plaintiff was

16    mildly positive for impingement and positive for supraspinatus stress test with mild relative

17    weakness.  Good strength was noted on internal rotation.  It is noted that elbow, wrist, hand, and

18    left upper extremity motion and exams were normal.  AR 264.  Dr. L'Insalata's impression

19    involved right shoulder stiffness with secondary impingement, status post previous dislocation

20    with probable AC sprain with some secondary degenerative changes, and cervical strain.

21    Plaintiff was to provide the doctor with his MRI report for review and return for further

22    treatment.  AR 265; *see also* AR 286-287, 321-322, 381-384, 462-463.

23    A treatment note dated September 9, 2003, includes an impression of right shoulder status

24    post sprain probable dislocation, possible SLAP tear versus labral tear, and secondary

25    impingement following physical examination.  The doctor requested authorization of right

26    shoulder arthroscopic surgery.  AR 315.

27

28

1    A treatment note dated September 30, 2003, includes an impression of right shoulder

2    status post sprain/dislocation, rule out SLAP tear, and labral tear with secondary impingement

3    following a physical examination.  AR 312.

4    A treatment note dated October 9, 2003, includes an impression of right shoulder biceps

5    tenosynovitis with probable SLAP tear, and possible anterior labral tear with secondary

6    impingement following physical examination and review of the MRI films.  AR 311.

7    Dr. L'Insalata performed surgery for a torn rotator cuff on Plaintiff's right shoulder on

8    December 18, 2003.  The findings reported were a 2+ inferior laxity, 2+ posterior laxity, and

9    negative sulcus sign compared to 1+ anterior and 2+ posterior laxity on the left shoulder, a 7mm

10   tear at the anterior-inferior labrum, mild chondral injury, a type 1 tear at the superior labrum,

11   high-grade partial tearing of the supraspinatus, and a large amount of subacromial bursitis and

12   some thickening of the coracoacromial ligament.  AR 390-396.

13   ***Noel Fleischer, M.D.***

14   A report dated April 25, 2003, by Noel Fleischer, M.D., a Board Certified Neurologist

15   with New York Neurology, P.C., included results of a neurologic examination and

16   electrodiagnostic testing.  The doctor's impression revealed slowing of the left median distal

17   motor latency and both median sensory conduction velocities consistent with left greater than

18   right carpal tunnel syndrome, and essentially normal upper extremity and cervical EMG findings.

19   AR 275; *see also* AR 288-289.

20   Dr. Fleischer also performed an examination of Plaintiff on May 13, 2005.  The report

21   indicates Dr. Fleischer performed a lower extremity EMG study revealing left L5-S1

22   radiculopathy, and an EMG of the upper extremities evidencing bilateral carpal tunnel syndrome.

23   The doctor noted "a suggestion of left cervical radiculopathy as well."  AR 179.  Plaintiff was

24   awake, alert and oriented during the examination, but had mild short-term memory problems

25   with diminished hearing in the right ear.  Tenderness in the cervical and lumbosacral regions was

26   present, as was spasm with impaired range of motion on cervical extension, rotation and lateral

27   flexion, of approximately twenty-five percent.  Lumbosacral flexion, extension and rotation was

28   limited to a thirty to forty percent extent.  AR 180; *see also* AR 466-468.

Plaintiff's right shoulder exhibited surgical scarring and limited range of motion in the right shoulder to eighty degrees.  Surgical scarring and limited movement of zero to sixty degrees was present in the right knee.  Left knee movement was limited to zero to ninety degrees. Bilateral postural hand tremors were present as well.  Pin prick testing revealed diminution in the right knee and both hands.  The right deltoid was weak, as were both hand grips and both tibialis anteriori.  Straight leg raising was positive bilaterally at approximately forty degrees.  Gait was antalgic with use of a cane.  AR 180.

Dr. Fleischer diagnosed a post-concussion syndrome with right-sided hearing loss, traumatic cervical radiculopathy, bilateral carpal tunnel syndrome, traumatic lumbar radiculopathy, internal derangement of the left knee, status-post right knee surgery, status-post right shoulder surgery and bilateral upper extremity tremors.  AR 180.  Medications included Percocet, Flexeril, Naprosyn and Motrin.  Dr. Fleischer believed the prognosis for a full recovery was "quite poor" as it had been more than three years since Plaintiff's motor vehicle accident in May 2002.  AR 180.  In Dr. Fleischer's opinion, Plaintiff was "disabled from any occupation due to his marked limitation of movement and difficulty sitting and bending."  AR 181.

### *Radiology Services of New York, P.C.*

A report dated October 7, 2003, following an MR arthrogram of the right shoulder revealed a Grade I SLAP tear versus mild degeneration, and moderate sized partial undersurface tear of the infraspinatus tendon.  AR 379-380, 387-388.

### *Andrew T. Cheng, M.D., F.A.C.S.*

On January 6, 2004, Dr. Cheng prepared an examination report concerning Plaintiff. Plaintiff was seen that same date and complained of right-sided ear ache and hearing loss following injury in January 2002.  A physical examination revealed normal external ears, ear canals and tympanic membranes.  Normal hearing status was detected in the left ear, however, hearing acuity was decreased in the right ear.  Following audiometric testing, Dr. Cheng's clinical diagnosis was moderate/severe neuro-sensory hearing loss, permanent in the right ear. Dr. Cheng recommended Plaintiff use a hearing aid.  AR 302; *see also* AR 303-304.

1

### Regional Radiology

2

An MRI of the cervical spine dated January 7, 2004, revealed degenerative changes

3  involving the C5-6 level with no significant radiographic abnormality of the lumbar spine.  AR

4  339.

5

### Chitoor S. Govindaraj, M.D.

6

Dr. Govindaraj performed a physical examination of Plaintiff on January 14, 2004, for the

7  New York State Department of Temporary and Disability Assistance.  The doctor's diagnoses

8  included status post right shoulder surgery, acute, awaiting rehabilitation; history of

9  hypertension; history of myocardial infarction; history of right shoulder dislocation; history of

10  low back syndrome; and history of right knee injury.  The doctor indicated Plaintiff's overall

11  prognosis was good.  AR 335-336; *see also* AR 340-343.

12

### Rajam Theventhiran, M.D.

13

Dr. Theventhiran performed a mental status examination of Plaintiff on February 28,

14  2004, for the New York State Department of Temporary and Disability Assistance.  Plaintiff

15  reported difficulties including a lack of social activity, easy to anger, occasionally yelling at

16  others, and loss of enjoyment of activities, following a work related injury wherein "a 400 pound

17  weight fell on top of his body."  AR 324.  Plaintiff provided a medical history that includes a

18  heart attack in February 2003, severe back, shoulder and neck pain, as well as bilateral knee pain.

19  AR 324.

20

A notation under the mental status examination portion of the doctor's report notes

21  Plaintiff was "irritable and angry at times during the interview" but was otherwise appropriate.

22  AR 325.  Speech was normal, thought process and content were normal, and Plaintiff reported no

23  feelings of guilt, hopelessness or worthlessness.  He did not suffer from auditory or visual

24  hallucinations, and had no suicidal or homicidal ideation.  Plaintiff was oriented to time, place

25  and person.  He was only able to remember one of three objects, but could remember his Social

26  Security number and phone number.  His intellectual functioning was fair, and insight and

27  judgment were limited regarding the need for treatment.  AR 325.

28

1   Plaintiff was living with his parents and would occasionally cook for himself and perform

2   basic cleaning chores.  His parents typically helped him with the shopping.  He could drive and

3   use public transportation.  He indicated he had no friends, nor did he have any hobbies.  AR 325.

4       Dr. Theventhiran's diagnosis was adjustment disorder not otherwise specified.  The

5   doctor recommended psychiatric treatment and evaluation.  AR 325-326; *see also* AR 329-332.

6   ***Andrew M. G. Davy, M.D.***

7       In a March 8, 2004, consultation with Dr. Davy regarding pain management, Plaintiff

8   reported he was involved in a work related injury wherein 400 pounds of merchandise fell on

9   him, crushing him.  He reported a loss of consciousness, dislocated right shoulder, concussion,

10  right knee injury, right-sided hearing loss, and headaches.  AR 276.  His primary complaints

11  during the examination involved the upper back with secondary neck and lower back pain.  He

12  reported high levels of pain on a scale of one to ten.  Plaintiff also reported tingling and

13  numbness in the fingers of both hands from the third to fifth digit.  AR 276-277.  A physical

14  examination included notations of a marked antalgic gait to the right, pain on forward flexion and

15  increased pain on extension of the lumbosacral spine, straight leg raises were positive at thirty

16  degrees, a positive Spurling's sign bilaterally on the neck, and multiple areas of tense trigger

17  points throughout the cervical and shoulders.  The doctor's initial diagnoses included upper back

18  pain secondary to multiple myofascial trigger points; neck pain secondary to cervical disc

19  disease, cervical radiculopathy, post-traumatic disc pathology, multiple myofascial trigger points

20  and possible facet syndrome; and low back pain secondary to post-traumatic disc pathology,

21  lumbar disc disease, lumbar facet syndrome and multiple myofascial trigger points.  AR 279.  Dr.

22  Davy recommended prescription medication changes, and sought authorization for ten medical

23  follow up visits, lumbar epidural steroid injections, cervical epidural steroid injections and

24  trigger point injections in the neck and upper back.  AR 279.  Dr. Davy noted that Plaintiff

25  remained "temporarily totally disabled from all work activities."  AR 280; *see also* AR 452-456.

26  ***Physical Residual Functional Capacity Assessment***

27      In a March 18, 2004, physical RFC assessment, J. Shelp, D.A. II, reported the following

28  limitations.  Exertional limitations included occasional lifting and carrying of twenty pounds,

15

1  frequent lifting and carrying of ten pounds, standing and/or walking for about six hours in an

2  eight-hour work day, sitting about six hours in an eight-hour work day, and unlimited pushing

3  and pulling.  AR 345.  Postural limitations included only occasional climbing, balancing,

4  stooping, kneeling, crouching and crawling.  AR 346.  Manipulative limitations included limited

5  reaching in all directions, and no limitations regarding handling, fingering and feeling.  AR 346.

6  No visual, communicative or environmental limitations were identified.  AR 347.

7             *Mental Residual Functional Capacity Assessment*

8             In a mental RFC assessment of March 25, 2004, Jane Stafford, Ph.D., reported the

9  following conclusions.  Plaintiff was not significantly limited in the area of understanding and

10  memory.  AR 351.  With regard to sustained concentration and persistence, he was moderately

11  limited in the ability to work in coordination with or proximity to others without being distracted

12  by them; otherwise, he was not significantly limited in this area.  AR 351.  With regard to social

13  interaction, Dr. Stafford found Plaintiff to be moderately limited in his ability to interact

14  appropriately with the public, ask simple questions or request assistance, accept instructions and

15  respond appropriately to criticism from supervisors, and get along with coworkers or peers

16  without distracting them or exhibiting behavioral extremes.  He was not significantly limited in

17  his ability to maintain socially appropriate behavior and to adhere to basic standards of neatness

18  and cleanliness.  AR 352.  Finally, Plaintiff was moderately limited in adaptation with regard to

19  the ability to set realistic goals or make plans independently of others; otherwise, he was not

20  significantly limited in this area.  AR 352.  Dr. Stafford concluded Plaintiff was "able to perform

21  simple, [entry level] work."  AR 353.

22             Dr. Stafford completed a Psychiatric Review Technique form on March 25, 2004, as well.

23  Her medical disposition was based upon an affective disorder that does not precisely satisfy

24  diagnostic criteria.  AR 355-358.  Functional limitations were not present in the activities of daily

25  living, were moderate regarding maintaining social functioning, and were mild regarding

26  maintaining concentration, persistence and pace.  It was noted Plaintiff had never suffered from

27  repeated episodes of deterioration or of an extended duration.  AR 365.

28

*Kaiser Permanente*

Generally speaking, the records reveal Plaintiff continues to complain of chronic back and neck pain, headaches and shoulder pain.  *See* AR 472-487.

ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since January 24, 2002, and had the severe impairments of degenerative disc disease, hearing loss, and an adjustment disorder.  AR 22.  Nonetheless, the ALJ determined that none of the severe impairments met or exceeded one of the listing impairments.  AR 23.

Based on his review of the medical evidence, the ALJ determined that Plaintiff retained the residual functional capacity ("RFC") to perform a significant number of jobs.  He could lift and carry ten pounds frequently and twenty pounds occasionally, and stand, walk and sit for six hours out of an eight-hour workday, could perform simple repetitive tasks, maintain attention, concentration, persistence and pace, relate to and interact with others, adapt to usual changes in work setting and adhere to safety rules, yet must avoid concentrated exposure to loud noise.  AR 25-27.

Given this RFC, the ALJ found that Plaintiff could not return to his past work as a warehouseman, institutional cook, child counselor or machine operator. AR 27.  Nevertheless, the ALJ found that Plaintiff could perform jobs that exist in significant numbers in the national economy.  AR 27-28.

**SCOPE OF REVIEW**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, the Court must determine whether the decision of the Commissioner is supported by substantial evidence.  42 U.S.C. § 405 (g).  Substantial evidence means "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must be considered, weighing both the evidence that supports and

1  the evidence that detracts from the Commissioner's conclusion. *Jones v. Heckler,* 760 F.2d 993,

2  995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

3  apply the proper legal standards. *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

4  This Court must uphold the Commissioner's determination that the claimant is not disabled if the

5  Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

6  substantial evidence. *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

7  Cir. 1987).

8  **REVIEW**

9      In order to qualify for benefits, a claimant must establish that he is unable to engage in

10  substantial gainful activity due to a medically determinable physical or mental impairment which

11  has lasted or can be expected to last for a continuous period of not less than twelve months.  42

12  U.S.C. § 1382c (a)(3)(A).  A claimant must show that he has a physical or mental impairment of

13  such severity that he is not only unable to do her previous work, but cannot, considering his age,

14  education, and work experience, engage in any other kind of substantial gainful work which

15  exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

16  The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th

17  Cir. 1990).

18      In an effort to achieve uniformity of decisions, the Commissioner has promulgated

19  regulations which contain, inter alia, a five-step sequential disability evaluation process.  20

20  C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f) (1994).  Applying this process in this case, the ALJ

21  found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of

22  his disability; (2) has an impairment or a combination of impairments that is considered "severe"

23  based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an

24  impairment or combination of impairments which meets or equals one of the impairments set

25  forth in Appendix 1, Subpart P, Regulations No. 4; (4) cannot perform his past relevant work as a

26  janitor or dishwasher; yet (5) retained the RFC to perform light work.  AR 11-18.

27      Here, Plaintiff argues that the ALJ impermissibly dismissed the examining physician's

28  opinion, improperly considered his pain and subjective complaints, erred in his RFC finding and

18

1  finding that Plaintiff could perform other work.  He contends this Court should reverse and order

2  the immediate payment of benefits.

3  **DISCUSSION**

4  **A.**   ***Treating and Examining Physicians***

5  Plaintiff contends the ALJ failed to give appropriate weight to the reports of Plaintiff's

6  treating and examining physicians.  (Doc. 11 at 17-21.)  The Commissioner respond the ALJ

7  assigned proper weight in accordance with the record.  (Doc. 13 at 7-10.)

8  Cases in this circuit distinguish among the opinions of three types of physicians: (1) those

9  who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant

10  (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining

11  physicians).  As a general rule, more weight should be given to the opinion of a treating source

12  than to the opinion of doctors who do not treat the claimant.  *Winans v. Bowen*, 853 F.2d 643,

13  647 (9th Cir. 1987).  At least where the treating doctor's opinion is not contradicted by another

14  doctor, it may be rejected only for "clear and convincing" reasons.  *Baxter v. Sullivan*, 923 F.2d

15  1391, 1396 (9th Cir. 1991).  Even if the treating doctor's opinion is contradicted by another

16  doctor, the Commissioner may not reject this opinion without providing "specific and legitimate

17  reasons" supported by substantial evidence in the record for so doing.  *Murray v. Heckler*, 722

18  F.2d 499, 502 (9th Cir. 1983).

19  The opinion of an examining physician is, in turn, entitled to greater weight than the

20  opinion of a nonexamining physician.  *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990);

21  *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  As is the case with the opinion of a treating

22  physician, the Commissioner must provide "clear and convincing" reasons for rejecting the

23  uncontradicted opinion of an examining physician.  *Pitzer*, 908 F.2d at 506.  And like the opinion

24  of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

25  can only be rejected for specific and legitimate reasons that are supported by substantial evidence

26  in the record.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

27  The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence

28  that justifies the rejection of the opinion of either an examining physician or a treating physician.

1    *Pitzer*, 908 F.2d at 506, n. 4; *Gallant*, 753 F.2d at 1456.  In some cases, however, the ALJ can

2    reject the opinion of a treating or examining physician, based in part on the testimony of a

3    nonexamining medical advisor.  *E.g., Magallanes v. Bowen,* 881 F.2d 747, 751-55 (9th Cir.

4    1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir. 1995).  For example,

5    in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician,

6    "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of

7    Magallanes's treating physicians . . .."  *Magallanes*, 881 F.2d at 752.  Rather, there was an

8    abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test

9    results, on contrary reports from examining physicians, and on testimony from the claimant that

10   conflicted with her treating physician's opinion.  *Id*. at 751-52.

11          Plaintiff complains that the ALJ did not state how the objective evidence in Dr.

12   Fleischer's May 2005 report does not support the marked limitation of movement and difficulty

13   sitting and bending.  He points to the doctor's findings on examination at pages 466 through 468

14   of the administrative record.  (Doc. 11 at 17.)

15          The ALJ noted:

16          An examination by Dr. Noel Fleischer in May 2005 demonstrated limited
            range of motion in the cervical and lumbar spine as well as positive straight leg
17          raising.  There was decreased pinprick sensation in the right knee and both hands,
            but it is not clear that any of this would have been related to the claimant's
18          degenerative disc disease.  There was also weakness in the right deltoid, both hand
            grips, and both tibialis anteriori, but no mention of any atrophy.  Dr. Fleischer
19          noted no reflex loss.  There is no further record of examination until the claimant
            was seen at Kaiser Permanente a year and a half later in December 2006
20          complaining of sudden onset of low back pain radiating to both legs.  There was
            limitation of motion of the lumbar spine, muscle strength was 4/5 bilaterally, and
21          reflexes were "slightly exaggerated".  Subsequent examinations in January and
            February 2007 demonstrated 5/5 muscle strength and negative straight leg raising.
22          These objective clinical findings do not satisfy the criteria of Section 1.04A.

23   (AR 24-25, internal citations omitted.)  Later, the ALJ found:

24          [T]he record also includes a report dated May 13, 2005, from Dr. Noel
            Fleischer wherein he stated that the claimant was disabled at that time from
25          performing any occupation due to "marked limitation of movement and difficulty
            sitting and bending".  It appears that Dr. Fleischer's familiarity with the claimant
26          is limited as he had previously seen the claimant on only one occasion when he
            administered electrodiagnostic testing in April 2003.  In addition, Dr. Fleischer's
27          May 2005 report is not supported by objective evidence.  In fact, while he stated
            in that report that the claimant's EMG was suggestive of left cervical
28          radiculopathy, his earlier report says the cervical needle EMG study was

                                              20

1    essentially normal.  In addition, it appears that the claimant was not subsequently
     treated for these "disabling" impairments until late 2006.  In any event, Dr.
2    Fleischer was asked to clarify his findings in a letter dated March 22, 2007, but he
     did not respond.  For those reasons, little weight has been given to Dr. Fleischer's
3    opinion.

4    (AR 26, internal citations omitted.)

5           Additional records were available to the ALJ that included essentially normal

6    examination findings in January 2004 ["neck movements normal," "range of motion [in spine]

7    totally was within normal limits," ["Posture is normal.  The patient does not use a cane for

8    ambulation . . . Hand dexterity normal.  No evidence of muscle spasm.  Straight leg raising test

9    normal" (*see* AR 335), and a finding that Plaintiff was capable of sedentary work in July 2004 by

10   a doctor who saw him frequently.  More particularly regarding the latter, Dr. L'Insalata treated

11   Plaintiff from June 2003 through July 2004 on approximately thirteen separate occasions.  *See*

12   AR 264-265, 381-384, 461-463; *see also* 401-402.

13          With specific regard to the ALJ's reference to a gap in treatment, Plaintiff's assertion that

14   he moved to California from New York, thus resulting in a delay of treatment, is unavailing on

15   this record.  The record establishes a delay in treatment of more than two years, save for a single

16   examination in May 2005.  *See Bunnell v. Sullivan*, 947 F.2d 341, 346-147 (9th Cir. 1991)

17   ("Another relevant factor may be unexplained or inadequately explained failure to seek treatment

18   or follow a prescribed course of treatment").  Moreover, Plaintiff has not provided any authority

19   for his assertion that such a delay "is not a reason to reject Dr. Fleischer's findings."  (Doc. 11 at

20   18.)

21          Next, Plaintiff asserts the ALJ erred by failing to give great weight to the report of Dr.

22   Davy because he did "not consider the objective evidence within" the report.  (Doc. 11 at 19.)

23          With regard to the report of Dr. Davy, the ALJ's findings state as follows:

24                 Dr. Andrew Davy, a pain management specialist who apparently examined
            the claimant on a single occasion on February 10, 2004, reported on March 8,
25          2004, that the claimant was "temporarily totally disabled".  Little weight has been
            given to this opinion as it is based on a single examination, reaches a conclusion
26          regarding disability without specific limitations, and only addresses the claimant's
            temporary status before recommended treatment was instituted.  Unfortunately, it
27          appears that the claimant did not return to Dr. Davy for follow up.

28

                                                    21

1  AR 26, internal citations omitted.  Dr. Davy is an examining physician,[3] thus, the ALJ was

2  required to provide "clear and convincing" reasons if the doctor's opinion was uncontradicted,

3  and specific and legitimate reasons if the opinion is contradicted.  *Pitzer v. Sullivan*, 908 F.2d at

4  506; *Andrews v. Shalala*, 53 F.3d at 1043.  The ALJ acknowledged that Dr. Davy examined

5  Plaintiff, and while he did not provide a recitation of Dr. Davy's objective findings, the ALJ's

6  decision at page 22 of the administrative record includes a notation that the "entire record" was

7  carefully considered.  The ALJ is not required to comment on every detail in every report.  As

8  noted in *Vincent v. Heckler*, 739 F.2d 1393, 1394-1395 (9th Cir. 1984), "[t]he Secretary . . . need

9  not discuss all evidence presented to her. Rather, she must explain why 'significant probative

10  evidence has been rejected.'"   A consultative examining physician is generally afforded less

11  weight than that of a treating physician because the treating physician has a unique perspective

12  that cannot be obtained from reports of an individual examination.  Here, the ALJ provided

13  specific and legitimate reasons for affording Dr. Davy's opinion little weight.  Dr. Davy's report

14  conflicted with the report of Dr. Govindaraj just one month prior.  *Cf.* AR 333-336.

15        With regard to the report of Dr. Abrams, the ALJ determined the following:

16        [T]he June 29, 2004 form appears to have been completed by David C. Abrams,
         D.C., a chiropractor who treated the claimant beginning February 20, 2003.  Dr.
17        Abrams states on the June 29, 2004 form that the claimant is unable to lift, carry,
         climb, push, pull, work over shoulder level, or do fine hand manipulation and is
18        totally disabled by permanent conditions.  Although a chiropractor is not an
         acceptable medical source and his opinion is not a medical opinion, Dr. Abram's
19        statement can be considered in determining the severity of the claimant's
         impairments and how they affect his ability to function pursuant to SSR 06-03p.
20        However, the undersigned has given greater weight to the medical opinion
         evidence already mentioned above addressing the claimant's physical capacities.
21

22  AR 25-26, internal citations omitted.  A chiropractor is considered an "other source" opinion.

23  *See* SSR 06-03p.  Because a chiropractor is not an accepted medical source, and because the ALJ

24

25

26        [3]A treating relationship is probably not established simply on the basis of one or even two examinations
   which were conducted at the request of another treating provider. *See Ghokassian v. Shalala*, 41 F.3d 1300, 1303
27  (9th Cir.1994) (treating relationship established after two visits when claimant saw no other physicians during the
   period, requested treatment, received prescriptions, and described doctor as his treating physician).
28

specifically stated he assigned greater weight to the accepted medical opinion evidence in the record, there was no error.

It is the ALJ's duty to resolve conflicts and ambiguity in the evidence. *See Morgan v. Commissioner*, 169 F.3d 595, 599-600 (9th Cir.1999). It is not the role of the court to second-guess the ALJ. *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir.1984). The Court must affirm the ALJ's decision where the evidence is susceptible to more than one rational interpretation. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir.1989). The court must uphold the ALJ's decision when it is not based on legal error and is supported by substantial evidence. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir.1999).

In sum, ALJ Berry's findings in this regard are supported by substantial evidence and are free of legal error.

**B.     *The RFC***

Plaintiff asserts the ALJ erred in determining his RFC.  More particularly, Plaintiff argues that the treating physicians imposed greater restrictions than that reflected in the ALJ's findings, that Plaintiff's need for a cane was not considered, and neither were Plaintiff's complaints regarding constant headaches.  (Doc. 11 at 21-23.)

Residual functional capacity ("RFC") is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of eight hours a day, for five days a week, or equivalent work schedule.  SSR 96-8p.  The RFC assessment considers only functional limitations and restrictions which result from an individual's medically determinable impairment or combination of impairments.  SSR 96-8p.  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'" *Robbins v. Social Security Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Here, the ALJ considered all relevant evidence in the record below, including the medical records particularly discussed above and included in the record.  Plaintiff complains the "treating physicians found much greater restrictions" than the ALJ found.  (Doc. 11 at 21.)  Yet, as

previously discussed, most of the physicians were examining physicians rather than treating physicians.  Moreover, Dr. L'Insalata, a physician who treated Plaintiff for more than two years in New York, did not impose specific functional limitations.  The ALJ considered all medical reports available in the record in determining Plaintiff's RFC.  The ALJ is responsible for resolving conflicts in the medical evidence.  *Magallanes v. Bowen*, 881 F.2d at 750.

Plaintiff complains the ALJ's RFC finding is erroneous because it did "not consider the need for the claimant's use of a cane, which he testified was prescribed to him for balance and to take pressure off of his knee when standing and walking."  (Doc. 11 at 21.)

Plaintiff did in fact testify that he was prescribed a cane following surgery on his right knee, performed by Francis A. Pflum, M.D.  AR 61.  However, the Court's review of the record did not reveal evidence of such a prescription, and neither has Plaintiff directed this Court's attention to relevant administrative medical record documents in support of his claim.  More particularly, Dr. Pflum's operative record does not include any notation regarding a cane.  AR 226-227.  There is insubstantial evidence that Plaintiff requires the use of a cane, as the only evidence offered is that of Plaintiff himself.

Despite the fact that others may have concluded differently, where the ALJ's findings are supported by substantial evidence in the record, the findings are entitled to deference.  *Bayliss v. Barnhart*, 427 F.3d 1211, 1214 (9th Cir. 2005).

Next, Plaintiff asserts the ALJ's finding did not consider the "constant headaches that the claimant gets because of his cervical pain."  (Doc. 11 at 21-22.)  The ALJ's findings include specific references to MRIs of the cervical spine: "MRI of the cervical spine in June 2002 was interpreted as showing central herniation, cord compression, and spinal stenosis at C3-4, C4-5 and C5-6 . . ..  On the other hand, a repeat MRI in December 2002 revealed only mild bulging of the annulus at hose three levels."  AR 22.  A CT scan of the head and MRI of the brain were normal.  AR 23.  Part and parcel to the ALJ's determination that Plaintiff's degenerative disc disease was not a severe impairment was the ALJ's consideration of the findings related to Plaintiff's spine.  AR 22-23.

With regard to Dr. Stafford's Mental Residual Functional Capacity Assessment, wherein Plaintiff asserts the ALJ failed to include those findings, the ALJ considered the findings in reaching his RFC assessment:

> Jane Stafford, Ph.D., a state agency psychologist, concluded that the claimant has the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders: no restriction of activities of daily living; moderate difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation.  She also found that the claimant fails to meet the "C" criteria of Section 12.04 of the Listings.
> The report of a consultative psychiatric examination in February 2004 generally supports that assessment.  The report indicates that the claimant is able to take care of his activities of daily living, drive and use public transportation, do basic cleaning, and occasionally cook and shop.  He denied any social activities and reported that he angers easily and sometimes yells at others.  He was irritable and angry at times during the interview but was otherwise cooperative and appropriate.  He did exhibit more than mild limitation in concentration as he was able to remember only one object out of three and had difficulty doing serial sevens.  There is no evidence of any psychiatric hospitalization or other decompensation.  In fact, there is no evidence of any true mental health treatment since the alleged onset date.  Under the circumstances, the undersigned concurs in the assessment of Dr. Stafford *except* to find that the claimant has moderate limitation in maintaining concentration, persistence or pace.

AR 25, emphasis added & internal citations omitted.  The ALJ plainly explained his reasons for not including Dr. Stafford's findings regarding moderate limitation in maintaining concentration, persistence and pace: Dr. Stafford's findings conflict with the findings of Dr. Theventhiran completed one month earlier. *Cf.* AR 324-326.

The ALJ's RFC determination is supported by substantial evidence and is free of legal error.

**C.    *Subjective Complaints & Pain Complaints***

Plaintiff argues that the ALJ failed to properly evaluate his subjective complaints and pain complaints. (Doc. 11 at 23-25.)  The Commissioner responds to the contrary, asserting that the ALJ's findings are supported by substantial evidence and are free of legal error.  (Doc. 13 at 10-11.)

The ALJ is required to make specific findings assessing the credibility of plaintiff's subjective complaints. *Ceguerra v. Secretary of HHS,* 933 F.2d 735 (9th Cir. 1991). In rejecting the complainant's testimony, "the ALJ must identify what testimony is not credible and what

1   evidence undermines the claimant's complaints." *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir.

2   1996) (quoting *Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir.

3   1988)).

4          "Despite the inability to measure and describe it, pain can have real and severe

5   debilitating effects; it is, without a doubt, capable of entirely precluding a claimant from

6   working." *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  It is possible to suffer disabling

7   pain even where the degree of pain is unsupported by objective medical findings. *Id*.  "In order to

8   disbelieve a claim of excess pain, an ALJ must make specific findings justifying that decision."

9   *Id*. (citing *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).  The findings must

10  convincingly justify the ALJ's rejection of the plaintiff's excess pain testimony. *Id*. at 602.

11  However, an ALJ cannot be required to believe every allegation of disabling pain.  "This holds

12  true even where the claimant introduces medical evidence showing that he has an ailment

13  reasonably expected to produce some pain." *Id*. at 603.

14         Once a claimant produces medical evidence of an underlying impairment likely to cause

15  the alleged pain, the ALJ may not discredit the allegations of the severity of the pain solely

16  because the evidence does not support plaintiff's statements. *Lester*, 81 F.3d at 834 (citing

17  *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991)(*en banc*))  In this case, the ALJ did not

18  ignore or reject plaintiff's testimony solely because it was unsupported by objective evidence.

19  The ALJ also made other findings in support of his determination that plaintiff's complaints of

20  pain were exaggerated.  The Court turns to address these findings.

21         In evaluating the credibility of the symptom testimony, it appears that the ALJ did

22  consider all of the factors set out in SSR 96-7P and 20 C.F.R. §§ 404.1529c(4)(i)(vii),

23  416.929(c)(4)(i)(vii). *See Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996), and *Bunnell,*

24  947 F.2d at 346.  The SSR directs the ALJ to:

25              Investigate all avenues presented that relate to subjective complaints,
            including claimant's prior work record and information and observations by
26          treating physicians and third parties regarding such matters as
                 1. The claimant's daily activities;
27               2. The location, duration, frequency, and intensity of claimant's symptoms
            or pain;

28

3.  Precipitating factors and aggravating factors;
4.  Type, dosage, effectiveness, and adverse side effects of any pain
medication;
5.  Treatment, other than medication, for pain relief;
6.  Any reasons used by the claimant to relieve the pain or symptoms; and
7.  Other factors concerning the claimant's functional limitations and
restrictions due to pain or other symptoms.

The ALJ may use "ordinary techniques" in addressing credibility.  *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), and may make inferences "logically flowing from the evidence."  *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir. 1996).

Here, the ALJ considered Plaintiff's subjective and pain complaints in the following passage:

> The claimant's statements regarding the severity of his symptoms and resulting limitations do not provide a reliable basis for imposing any further restrictions on his functional capacity.  He testified that he stopped working in January 2002 after he injured his head, neck, back, right upper extremity, and right knee when he was crushed by about 400 pounds falling on him.  However, it appears that the claimant has a tendency to exaggerate as the original emergency room records indicate that the accident involved a hand truck carrying 100 pounds.  He testified that his right shoulder was dislocated at the time of the accident, but x-rays of the right shoulder at that time showed no acute fracture or dislocation.  He described engaging in minimal daily activities due to his alleged symptoms and limitations, but his statements to the consultative psychiatrist indicate a broad and relatively normal range of daily activity.  He stated that his medications cause drowsiness and nausea, but his medical treatment records reflect only a complaint of nausea from using a Duragesic Patch, for which he was given Phenergan to take as needed.  Despite his complaints of disabling pain, there is nothing in the record showing any medical treatment or examination between July 2004 and September 2006 apart from the examination by Dr. Fleischer in May 2005 to obtain a medical report.  Furthermore, in December 2006, he stated that he wanted to be treated conservatively and did not want to have any procedure, apparently referring to a recommendation that he have a lumbar epidural injection.  Under the circumstances, the claimant's subjective complaints are not entirely credible.

AR 26-27, internal citations omitted.

An ALJ may consider a claimant's lack of medical treatment in assessing credibility. *Burch v. Barnhart*, 400 F.3d 676, 681 (9th Cir. 2005).  This Court is mindful too that a claimant may not be denied disability benefits because he or she is unable to afford treatment.  *Orn v. Astrue*, 495 F.3d 625 (9th Cir. 2007).  Nonetheless, the evidence that Plaintiff directs this Court to in support of his apparent claim the ALJ should have questioned Plaintiff about the lack of treatment between July 2004 and September 2006, as it relates to Plaintiff's relocation from New

1   York to California, is wholly persuasive. The ALJ's decision is dated July 3, 2007. Plaintiff

2   directs this Court's attention to a copy of correspondence entitled "Wilbert Sebbern's response to

3   unfavorable decision," dated August 11, 2007. AR 531-532. The ALJ could not have known

4   that a purported cause for Plaintiff's delay in treatment was perhaps due to a lack of funds

5   because there is no such evidence in the record that predates the ALJ's decision.

6       ALJ Berry was not required to believe all of Plaintiff's allegations regarding pain. *Orn v.*

7   *Astrue*, 495 F.3d at 635. Further, ALJ Berry specifically identified what testimony was not

8   credible and what evidence undermined Plaintiff's complaints. *Lester v. Chater,* 81 F.3d at 834.

9   Even had one of ALJ's reasons amounted to error, this Court would uphold his credibility

10  determination. *See eg., Batson v. Barnhart*, 359 F.3d 1190, 1197 (9th Cir. 2004). If the ALJ's

11  finding is supported by substantial evidence, the Court "may not engage in second-guessing."

12  *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir 2002).

13      In conclusion, ALJ Berry's findings regarding Plaintiff's credibility and pain complaints

14  are supported by substantial evidence and are free of legal error.

15      **D.      *Other Work***

16      Finally, Plaintiff asserts the ALJ erred in determining he could perform other work

17  because the treating physician reports and state agency psychiatric report include "the need for a

18  cane and the moderate impairments in certain mental functions . . .." He claims when those

19  limitations were presented to the VE in a hypothetical, the VE indicated that such an individual

20  was not capable of work. (Doc. 11 at 25-27.) The Commissioner answers that the hypothetical

21  posed to the VE and replied upon by the ALJ was supported by the record, and that even if

22  Plaintiff were precluded from work as a bottling line attendant, Plaintiff could still perform the

23  work of a housekeeping cleaner. (Doc. 13 at 11.)

24      "Hypothetical questions posed to the vocational expert must set out all the limitations and

25  restrictions of the particular claimant . . . ." *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.1988).

26  The testimony of a VE "is valuable only to the extent that it is supported by medical evidence."

27  *Sample v. Schweiker*, 694 F.2d 639, 644 (9th Cir. 1982). The VE's opinion about a claimant's

28  residual functional capacity has no evidentiary value if the assumptions in the hypothetical are

1  not supported by the record. *Embrey*, 849 F.2d at 422.  Finally, an ALJ is only required to

2  present the VE with those limitations he finds to be credible and supported by the evidence.

3  *Osenbrock v. Apfel*, 240 F.3d 1157, 1165-66 (9th Cir. 2001).

4       Here, ALJ Berry presented the VE with two hypothetical questions, whereas Plaintiff's

5  attorney presented about three hypothetical scenarios.  The ALJ hypothetical questions reflect

6  those limitations he found to be credible and supported by evidence:

7         [ALJ Berry]: Now, Mr. Chaparro, please consider a hypothetical
   individual 38 years of age, twelfth grade education and past relevant work
8  experience just described.  This individual has the combination of severe
   impairments and retains residual functional capacity to lift and carry 20 pounds
9  occasionally, 10 pounds frequently.  This individual retains the ability to stand and
   walk six hours each.  This individual retains the ability to perform simple
10 repetitive tasks as well as maintain attention, concentration, persistence and pace.
   This individual retains the ability to relate to and interact with others as well as
11 adapt to a usual change in his work setting and adhere to safety rules.  This
   individual must avoid a concentrated exposure to loud noise.  Given these
12 limitations and these alone, can such an individual perform this Claimant's past
   work?
13        [VE]: No.  He can't.
          Q.  Can such an individual perform any other job[s] which exist in the
14 national economy?
          A.  Yes.
15        Q.  Give me three examples, please.
          A.  Yes, sir.  First example is bottling line attendant, which is light and
16 unskilled . . . DOT code is 920.687-042 . . . Casing splitter.  It's meat products.
   It's light and unskilled.  The DOT code is 525.687-014 . . . Housekeeping cleaner,
17 light work and unskilled, DOT code is 323.687-014. . . .
          Q.  Now, for my second hypothetical person, please assume a hypothetical
18 individual with the same vocational parameters as the previous hypothetical
   person.  This individual also has a combination of severe impairments.  Further
19 assume this hypothetical individual retains residual functional capacity to stand
   two and a half hours total, walk one block maximum.  The individual retains the
20 ability to sit 45 to 60 minutes.  This individual retains the ability to lift 10 to 15
   pounds rarely and carry seven to 10 pounds.  This individual would have difficulty
21 with gripping and grasping.  This individual must avoid exposure to large crowds
   as well as loud noise.  And this individual must avoid using the dominant right
22 upper extremity in overhead activities.  Given these limitations and these alone,
   can such an individual perform any of the Claimant's past work?
23        A.  No.
          Q.  Can any - - can such an individual perform any job which exists in the
24 national economy?
          A.  No, no other jobs.
25

26 AR 81-83.  ALJ Berry committed no error as he was not required to adopt the hypothetical

27 question posed by Plaintiff's counsel nor was he required to present a hypothetical scenario that

28 was not credible or supported by the evidence.

1   Plaintiff also contends the bottling line attendant position identified involves loud noise

2   yet he was to avoid concentrated exposure to loud noise.  (Doc. 11 at 26.)  The Commissioner

3   responds that the housekeeping cleaner position involves a moderate level of noise, and thus, the

4   ALJ's decision "is still supported by substantial evidence because the failure to specifically

5   address the issue is, at the most, harmless."  (Doc. 13 at 11.)

6   The record contains descriptions from the DOT for the casing splitter, bottling line

7   attendant, and housekeeping cleaner positions.  *See* AR 518-526.  The noise level for the bottling

8   line attendant position is indeed loud.  AR 523.  However, the noise level for a case splitter

9   position is moderate (AR 520), as is the noise level for a housekeeping cleaner (AR 526).

10   SSR 00-4p states that generally, occupational evidence provided by a VE should be

11   consistent with the occupational information supplied by the DOT.  Where there is an apparent

12   conflict, the ALJ must elicit a reasonable explanation for the conflict before relying on the VE to

13   support a determination or decision about whether the claimant is disabled.  *See* SSR 00-4p.  The

14   ALJ may rely on the testimony of a VE over that of the DOT by determining that the explanation

15   given by the VE is reasonable and provides a basis for doing so.  *Id.*

16   Although evidence provided by a VE "generally should be consistent" with the DOT,

17   "[n]either the [ Dictionary of Occupational Titles ] nor the [vocational expert] ... evidence

18   automatically 'trumps' when there is a conflict."  *Massachi v. Astrue,* 486 F.3d 1149, 1153 (9th

19   Cir. 2007) (citing SSR 00-4p).  Thus, the ALJ must first determine whether a conflict exists.  If it

20   does, the ALJ must then determine whether the vocational expert's explanation for the conflict is

21   reasonable and whether a basis exists for relying on the expert rather than the DOT.  *Id.*  Where

22   the ALJ fails to ask the VE is the positions are consistent with the DOT, the Court is unable to

23   determine whether substantial evidence supports the ALJ's finding at step five.  *Id.*

24   ALJ Berry's findings state as follows:

25        The vocational expert testified that given all of these factors the individual
        would be able to perform the requirements of representative unskilled light
26       occupations such as bottling-line attendant, 920.687-042 (1,000 jobs in California
        and 7,500 nationally); case splitter, 525.687-014 (900 jobs in California and 9,800
27       nationally); and housekeeping cleaner, 323.687-014 (18,900 jobs in California and
        143,300 nationally).  Pursuant to SSR 00-4p, the vocational expert's testimony is

28

30

1   consistent with the information contained in the Dictionary of Occupational
    Titles.
2           Based on the testimony of the vocational expert, the undersigned
    concludes that, considering the claimant's age, education, work experience, and
3   residual functional capacity, the claimant has been capable of making a successful
    adjustment to other work that exists in significant numbers in the national
4   economy.  A finding of "not disabled" is therefore appropriate . . ..

5   AR 28.  When there is an apparent unresolved conflict, the ALJ must inquire, on the record,

6   about the inconsistency, and must obtain a reasonable explanation for the conflict. SSR 00-4p,

7   2000 WL 1898704, at *2.  The failure to do so constitutes procedural error.  *Massachi*, 486 F.3d

8   1149, 1153-54 & n. 19. Such error is harmless, however, if there was no conflict or if the VE

9   provided sufficient support for his or her conclusion so as to justify any potential conflicts.  *Id*. at

10  1154, n. 19.

11          Here, the ALJ failed to ask the VE whether his testimony conflicted with the DOT and, if

12  so, whether there was a reasonable explanation for the conflict.  AR 54-88.  Nevertheless, the

13  failure to ask about a conflict is harmless where there is no conflict or where the VE provided

14  sufficient support for his or her conflict "so as to justify any potential conflicts."  *Massachi v.*

15  *Astrue*, 486 F.3d at 1154, n. 19.  VE Chaparro provided three job titles that Plaintiff could

16  perform.  Plaintiff has identified only one of the three positions as conflicting with the DOT:

17  bottling line attendant. The other two positions identified by the VE satisfy the Commissioner's

18  burden at step five, and sufficiently support the decision.  According to the uncontradicted

19  testimony of the VE, a total of 19,800 jobs in California remain available in the case splitter and

20  housekeeping cleaner categories; 153,100 of such positions are available nationally.[4]  AR 81-82.

21          Therefore, because the case splitter and housekeeping cleaner positions identified by the

22  VE do not conflict with the DOT, the ALJ's failure to ask the VE whether or not his testimony

23  conflicted with the DOT is harmless error.

24

25

26          [4]Reported opinions have found numbers ranging from 1,350 to 675 to be significant.  *See Moncado v.*
    *Chater*, 60 F.3d 521, 524 (9th Cir.1995) (2,300 jobs in region & 64,000 nationwide significant) (citing *Barker v.*
27  *Sec'y of Health and Human Servs.*, 882 F.2d 1474, 1479 (9th Cir.1989)).

28

1

**<u>CONCLUSION</u>**

2       Based on the foregoing, the Court finds that the ALJ's decision is supported by

3   substantial evidence in the record as a whole and is based on proper legal standards.

4   Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the

5   Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in

6   favor of Defendant Michael J. Astrue, Commissioner of Social Security and against Plaintiff,

7   Wilbert C. Sebbern, Jr.

8

9

10       IT IS SO ORDERED.

11   **Dated:   January 28, 2010**                   **/s/ Gary S. Austin**
                                         UNITED STATES MAGISTRATE JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28